# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **RAFAEL RODRIGUEZ-SANCHEZ**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES OF AMERICA**, *et al.*, <br><br> Defendants. | Civil No. 14-1073 (FAB/BJM) |

## REPORT AND RECOMMENDATION

Rafael Rodriguez-Sanchez ("Rodriguez"), in his personal capacity and on behalf of his minor daughter, C.R.T.; Alexis Rodriguez Mena; Randall Rodriguez Mena; and Ricardo Rodriguez Mena[1] (collectively "plaintiffs") brought this medical malpractice action under the Federal Tort Claims Act ("FTCA") against the United States of America and the Department of Veterans Affairs ("VA") (collectively "the government"), alleging negligence and negligent infliction of emotional distress under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141, 5142. Am. Compl., Docket No. 25. Plaintiffs failed to disclose an expert witness by the court-ordered deadline, Docket No. 22, the government moved, without opposition, to preclude plaintiffs from presenting an expert witness at trial, Docket No. 29, and the court granted that motion, Docket No. 31. The government subsequently moved for summary judgment, Docket Nos. 32, 42, and the plaintiffs opposed, Docket No. 39. This matter was referred to me for a report and recommendation. Docket No. 44.

For the following reasons, the motion should be **GRANTED**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] The latter three individuals are Rodriguez's adult children. Am. Compl. ¶¶ 4–8.

Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation," *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[2] submissions.[3] I note that plaintiffs' SAMF presented an extraordinary

---

[2] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for

number of irrelevant facts.[4] Irrelevant facts have been ignored, and so the account below includes only those facts material to the outcome.

*First Surgery*

On March 1, 2011, VA medical staff performed various surgical procedures on Rodriguez's abdominal area to treat recurrent diverticulitis and rectal bleeding. SUMF ¶¶ 1–2. Before his surgery, he met with a VA surgeon and signed an informed-consent form. SUMF ¶ 4. That form indicates the known risks of the various surgical procedures that were going to be performed. SUMF ¶ 5. The medical records indicate that no complications were reported from the surgery and that a complete instrument, needle, drape, and sponge count was performed. SUMF ¶ 3. There is a genuine dispute as to whether Rodriguez or his son received any post-surgery instructions about caring for the wound. SUMF ¶ 7; Docket No. 39-3 at 136:21–137:1–16. Yet, his medical records from March 6 and 8 do not indicate that he reported any post-surgery complications that were causing him pain. SUMF ¶¶ 6, 9.

On March 11, Rodriguez was seen at the VA hospital to treat a "gout attack." SUMF ¶ 10. Suffering from abdominal pain and various other symptoms, he returned to

---

summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). The court may deem the movant's facts uncontested if they are not properly controverted in compliance with the rule, and litigants ignore it "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

Plaintiffs' OSMF did not fully comply with the Local Rule because it purportedly "qualified" many of the SUMF's statements while actually admitting them. *See, e.g.*, OSMF ¶¶ 3, 15.

[3] The government's statement of uncontested material facts ("SUMF"), Docket No. 32-2; plaintiffs' opposing statement of material facts ("OSMF"), Docket No. 39-1; plaintiffs' statement of additional material facts ("SAMF"); and the government's replies to plaintiffs' OSMF, Docket No. 42-1, and SAMF, Docket No. 42-2.

[4] For example, the SAMF included as material facts that Rodriguez's "favorite pastime is writing poems and listening to music," SAMF ¶ 14, and that his house "consists of three bedrooms, one bathroom, one unfinished bathroom, a kitchen, a dining room, and a living room," *id.* ¶ 5.

the VA hospital on March 14. SUMF ¶ 11. He was readmitted to the hospital after a partial small bowel obstruction was discovered. SUMF ¶ 11. That same date, a gastric-decompression procedure was performed. SUMF ¶ 11.

*Second Surgery*

On March 15, what appeared to be a complete obstruction in Rodriguez's bowel was discovered and the possibility of surgery was discussed with him. SUMF ¶ 13. He met with VA medical staff to discuss the procedure and signed an informed-consent form. SUMF ¶ 16. After doing so, various surgical procedures were performed. SUMF ¶ 14. His medical records do not indicate any complications during the procedure, and a complete instrument, needle, drape, and sponge count was performed. SUMF ¶ 15. After this surgery, a post-operative infection was discovered and treated with antibiotics. SUMF ¶ 17.

After he was discharged from the hospital on March 22, VA medical staff assisted Rodriguez with caring for his wound. SUMF ¶ 20. He was also provided with literature on caring for his wound that he admittedly did not read. SUMF ¶ 21. On March 28, Rodriguez visited the VA hospital, and the staples on his wound were removed. SUMF ¶ 23. He returned the next day, however, complaining that the abdominal wound was draining fluid. SUMF ¶ 24. At that time, an abscess was discovered and a small incision was made to permit cleaning and drainage. SUMF ¶ 25. After this procedure was performed, he understood that the post-surgery instructions he received on March 22 to care for his wound remained applicable. SUMF ¶ 26.

In early April 2011, he was treated for a superficial wound infection. SUMF ¶ 27. On April 14, he fell in his home, suffered head trauma, was admitted to the VA hospital, and received sutures on his head. SUMF ¶ 28. He was discharged from the hospital on April 16. His surgical wound was again checked on April 18, when he visited the hospital. SUMF ¶ 30. Thereafter, he attended various follow-up appointments to care for and observe his wound. SUMF ¶¶ 31, 36.

### *Object in Rodriguez's Abdomen*

On May 27, 2011, Rodriguez visited the VA Wound-Care Clinic. SUMF ¶ 37. During that visit, Rodriguez was complaining of pain in his abdomen. SUMF ¶ 37. Wound Specialist Myrna Abrams Valle ("Abrams") examined him and identified a granuloma[5] that was being produced by an object she identified as a suture. SUMF ¶ 37. She informed Dr. Jose Sorrentino Brunisholz ("Sorrentino"), who confirmed the granuloma, confirmed that the object was a suture, and removed the suture. SUMF ¶ 40, 42.

And contrary to the allegation in the amended complaint, Abrams testified that a "metal rod" was not removed from Rodriguez's abdomen. Am. Compl. ¶¶ 99, 106(m); SUMF ¶ 45. Rodriguez readily admitted that he is not familiar with any surgical equipment and therefore could not precisely identify the object removed from his body. SUMF ¶ 60. He did, however, describe the object as dark silver, three- to four-and-a-half inches long, flexible, and malleable. OSMF ¶ 92. The description of the object given by Abrams and Sorrentino was very similar, making the differing accounts immaterial. Abrams described the object as a thread of black suture that was three- to four-inches long. Docket No. 32-9 at 133–134. Sorrentino described the object as a three-inch long, dark blue, Prolene suture. Docket No. 32-10 at 38, 40. Sorrentino also confirmed that Prolene sutures had been used to close Rodriguez's surgical wound. SUMF ¶ 48. Feeling confident that he had correctly identified the object, Sorrentino did not send it to the pathology laboratory to be identified. SUMF ¶ 52. After the May 27 visit, the parties agree Rodriguez's pain eased and that he eventually recovered. SUMF ¶ 60.

### *Lack of an Expert Witness*

Rodriguez has not spoken to a physician or anyone in the medical community to evaluate the soundness of the surgeries and medical treatment he received at the VA

---

[5] Abrams described a granuloma as "some kind of tissue popping out." She testified that it "usually" occurs when the body's tissue "cannot close by itself." SUMF ¶ 39.

hospital. SUMF ¶ 61. Rather, he alleges that notwithstanding the various notes in his medical records, he experienced pain in his abdominal area, as well as other symptoms, from March 2011 until he fully recovered. He believes he experienced these symptoms because "something had gone wrong" during the various medical procedures. SUMF ¶ 60.

This court ordered the parties to disclose any expert witnesses by September 5, 2014. Docket No. 22. On September 23, the government moved to preclude plaintiffs from presenting an expert witness at trial because they had not disclosed one by the court-ordered deadline. Docket No. 29. In November 2014, the court granted the motion, reasoning two months had passed since the court-ordered deadline and that plaintiffs did not oppose the government's motion. Docket No. 31.

## DISCUSSION

The government contends it is entitled to summary judgment because plaintiffs cannot establish any of their causes of action without an expert witness. Rodriguez responds that he possesses "personal knowledge" to show "the breach of the standards of medical care" and to establish the plaintiffs' claims.[6] Pls.' Opp'n 5.

**I.     FTCA**

The FTCA is a limited waiver of sovereign immunity by the United States whereby a claimant can sue for the "negligent or wrongful act or omission" of certain government employees. 28 U.S.C. § 1346(b)(1). Per § 1346(b)(1), the "law of the place" supplies the "substantive rules to be used in deciding FTCA actions." *Bolduc v. United States*, 402 F.3d 50, 56 (1st Cir. 2005). "The phrase 'law of the place' refers to the law of

---

[6] Plaintiffs do not suggest anywhere in their opposition that this court improperly precluded them from presenting an expert witness. Even if they had, their failure to comply with the court-ordered deadline permitted the preclusion order. *See Martinez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 283 (1st Cir. 2009) ("Where . . . a party aspires to present expert testimony but does not adhere to the district court's temporal benchmarks, the court has a range of options. One of those options is preclusion").

the state in which the allegedly tortious acts or omissions occurred." *Id.* Puerto Rico law provides the standard of liability in this FTCA action because the alleged medical malpractice occurred in Puerto Rico. *Torres-Lazarini v. United States*, 523 F.3d 69, 72 (1st Cir. 2008). Plaintiffs' amended complaint and opposition reveal various theories that can generally be categorized as follows: (1) medical malpractice by the VA healthcare professionals; (2) claims that the VA healthcare professionals failed to adequately inform Rodriguez of the potential negative consequences of the surgeries (i.e., informed-consent claims); and (3) derivative claims by Rodriguez's children, both minor and adult, for negligent infliction of emotional distress. I examine each of these categories in turn.

## II. Medical Malpractice

Under Puerto Rico law, a medical malpractice action is fault-based. *Martinez–Serrano*, 568 F.3d at 285. As such, the Puerto Rico Supreme Court has held that malpractice actions against physicians are governed by Article 1802 of the Puerto Rico Civil Code. *See, e.g., Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712, 728 n.10 (P.R. 1992). Article 1802 provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141.

Under this framework, to establish a prima facie case of medical malpractice "a plaintiff must adduce evidence showing at least three separate things: (1) the duty owed, expressed as the minimum standard of professional knowledge and skill required under the circumstances then obtaining; (2) a breach of that duty attributable to the defendant; and (3) a sufficient causal nexus between the breach and the plaintiff's claimed injury." *Rolon-Alvarado v. Municipality of San Juan*, 1 F.3d 74, 77 (1st Cir. 1993). Under Puerto Rico law, there is "always a presumption that the treating physicians have observed a reasonable degree of care . . . in the process of giving medical attention and treatment." *Id.* (quoting *Del Valle Rivera v. United States*, 630 F. Supp. 750, 756 (D.P.R. 1986)). A plaintiff "bears the burden of refuting this presumption." *Rolon-Alvarado*, 1 F.3d at 78.

To rebut the presumption, the plaintiff "must first establish the physician's duty." *Id.* The "minimum standard of acceptable care is almost always a matter of informed opinion" that "must ordinarily be established by expert testimony" because "medical knowledge and training are critical to demonstrating the parameters of a health-care provider's duty." *Id.* (citing *Oliveros v. Abreu*, 1 P.R. Offic. Trans. 293, 315 (P.R. 1973)). Without an expert witness to establish the standard of care, a factfinder is "rarely able to determine the applicable standard of care." *Rojas–Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia*, 394 F.3d 40, 43 (1st Cir. 2005). And without being able to do so, the trier of fact lacks a "legally satisfactory basis for making a reasoned determination" as to whether the healthcare professionals were negligent in caring for the plaintiff. *Rolon-Alvarado*, 1 F.3d at 79.

Yet, the "absence of expert testimony is not necessarily dispositive in all medical malpractice cases brought under Puerto Rico law." *Martinez-Serrano*, 568 F.3d at 286 n.4. There is a narrow exception that "encompasses only those few situations in which the claimed medical malpractice is sufficiently blatant or patent that lay persons, relying on common knowledge and experience, can legitimately recognize or infer negligence." *Rolon-Alvarado*, 1 F.3d at 79.

With this authority underfoot, Rodriguez's contention that he can establish the standard of medical care with his "personal knowledge" and without an expert witness is untenable. *See Rojas–Ithier*, 394 F.3d at 43. Without the assistance of an expert witness, a factfinder will be unable to determine the standard of care applicable to the surgeries and other medical procedures performed on Rodriguez. *See, e.g.*, *Rolon-Alvarado*, 1 F.3d at 79. Indeed, plaintiffs do not seriously contend that a layperson can determine, for example, the applicable standard of care for the exploratory laparotomy or other procedures performed on Rodriguez before, during, and after his first and second surgeries at the VA hospital.

Attempting to shoehorn one of his claims into the "blatant or patent" medical malpractice exception recognized in *Rolon-Alvarado*, Rodriguez claims a "foreign object" was "negligently left" inside his abdomen and that his "wound healed completely about one month after" the removal of the object. Pls.' Opp'n 13; OSMF 15. That attempt is unavailing for at least three reasons.

First, a blatant or patent case of medical malpractice is not evident here. Contrary to the allegation in the amended complaint, Wound Specialist Abrams testified that a "metal rod" was not removed from Rodriguez's abdomen. And to ensure no surgical equipment remained inside Rodriguez's body, a complete instrument, needle, drape, and sponge count was performed by the VA healthcare professionals at the conclusion of both of his surgeries. SUMF ¶¶ 3, 15.

Moreover, Rodriguez readily admitted that he is not familiar with any surgical equipment and therefore could not precisely identify the object removed from his body. He did, however, describe the object as dark silver, three- to four-and-a-half inches long, flexible, and malleable. The description of the object given by Dr. Sorrentino and Wound Specialist Abrams was similar. Abrams described the object as a thread of black suture that was three- to four-inches long. Dr. Sorrentino described the object as a three-inch long, dark blue, Prolene suture. Dr. Sorrentino later confirmed that Prolene sutures had been used to close Rodriguez's surgical wound.

Because plaintiff has presented no expert witness, a factfinder would have no basis to determine whether the suture was properly applied or removed. *See, e.g.*, *Legg v. Chopra*, 286 F.3d 286, 292 (6th Cir. 2002) (expert testimony was necessary to establish standard of care when applying sutures); *Sheahan v. Suliene*, No. 12-CV-433-BBC, 2014 WL 1233700, at *8 (W.D. Wis. Mar. 25, 2014) ("undisputed expert medical testimony indicat[ed] that the decision to remove the sutures was medically appropriate").

Second, even assuming for argument's sake that a factfinder could proceed to the causation analysis concerning the object removed from Rodriguez's abdomen, "a

factfinder normally cannot find causation without the assistance of expert testimony." *Martinez-Serrano*, 568 F.3d at 286 (quoting *Rojas–Ithier*, 394 F.3d at 43). The First Circuit has explained that "[t]his is so because medical malpractice is a field in which the issues tend to be scientifically driven and more nuanced than in most tort cases." *Martinez-Serrano*, 568 F.3d at 286. Under the circumstances of this case, a layperson is ill-equipped without the assistance of an expert witness to determine whether the object was causing Rodriguez's health woes or whether Rodriguez's health began to improve coincidentally with the removal of the object. Because Rodriguez failed to retain an expert witness, his claim that the object was causing his health troubles amounts to a speculative, unsubstantiated allegation. *See Rojas-Ithier*, 394 F.3d at 4.

       Third, Rodriguez presses that Dr. Sorrentino should have sent the object to the pathology laboratory to be identified. But once again, without an expert witness, a factfinder is unable to determine the applicable standard of care. *See Rolon-Alvarado*, 1 F.3d at 79 ("hospital protocol[, among other things, are] matters which are neither obvious to the untrained eye nor, by any stretch, within a layman's ken").

       Notwithstanding the above, Rodriguez contends summary judgment is improper because the "conflicting testimony by the witnesses deposed" shows a "genuine dispute of material fact" that requires a "full blown hearing." Pls. Opp'n 5. Not so. The First Circuit considered a similar argument in a medical malpractice case where the plaintiff failed to secure an expert witness and held that "[t]he existence of contradictions, standing alone . . . is not enough to preclude summary judgment." *Rojas-Ithier*, 394 F.3d at 44 & 44 n.4. In sum, because Rodriguez does not have an expert witness to establish the duty and causation elements of his medical malpractice claims, the court should grant summary judgment on those claims.

## III. Informed Consent

Under Puerto Rico law, the doctrine of informed consent "imposes on physicians the duty to inform their patients about the nature and risks of the proposed medical treatment in order to place the patients in a position to reach an intelligent and informed decision." *Santana-Concepcion v. Centro Medico del Turabo, Inc.*, 768 F.3d 5, 13 (1st Cir. 2014) (quoting *Lozada–Tirado v. Tirado–Flecha*, 177 P.R. Dec. 893 (2010)). A physician need not inform the patient of "every remote, hypothetical risk posed by a medical procedure"; rather, "the scope of the duty varies with the nature of the proposed treatment." *Santana-Concepcion*, 768 F.3d at 13 (citing *Sepúlveda de Arrieta v. Barreto*, No. RE–90–41, 1994 WL 908876 (P.R. Dec. 23, 1994)).

The "specific information the physician should offer in each particular case" depends on information that would be given by "the average physician pursuant to the standards prevailing in the medical community." *Sepúlveda de Arrieta*, No. RE–90–41, 1994 WL 908876. As in a case for medical malpractice, an expert witness is necessary to establish the information that should have been divulged to the patient. *See id.* ("[t]he *expert* for the defendants testified that these are 'the most common' complications and 'may be caused by a blepharoplasty even under the most skilled hands.' The patient should have been informed of these risks before she consented to the surgery") (emphasis added).

In this case, Rodriguez acknowledges that he received and signed an informed-consent form before each of his surgeries. However, he contends the information contained in those forms was inadequate. But because Rodriguez does not have an expert witness, he is unable to establish the "specific information" an average physician would have disclosed "pursuant to the standards prevailing in the medical community." *Sepúlveda de Arrieta*, No. RE–90–41, 1994 WL 908876. Without being able to do so, the court should grant summary judgment on his informed-consent claims.

The court should grant summary judgment on the informed-consent claims for a second, alternative reason. To prevail on such a claim, a plaintiff must also "prove that the complained-of injury resulted from the failure of the physician to fully inform the patient (i.e., causation)." *Santana-Concepcion*, 768 F.3d at 13. Under Puerto Rico law, "the question of proximate causation is viewed from the perspective of the physician [and] the analysis does not turn on whether the patient would have declined to consent if provided with the allegedly absent information." *Id.* This is so because "[c]ontrary to the United States model—that focuses on the decision-making process of the injured party, whether objective or subjective—civil law tradition focuses on the alleged aggravating circumstance." *Id.* (quoting *Sepulveda de Arrieta*, No. RE–90–41, 1994 WL 908876). Accordingly, the appropriate inquiry is whether "in the normal course of events [the physician] had to foresee that the lack of pertinent information would lead [the] patient . . . to take a different decision than the one she would have taken if she had been suitably informed." *Santana-Concepcion*, 768 F.3d at 13 (quoting *Sepulveda de Arrieta*, No. RE–90–41, 1994 WL 908876).

Applying this framework, the *Santana-Concepcion* court affirmed summary judgment on an informed-consent claim where the plaintiffs "failed to direct the Court to facts [the doctor] could have relied upon to foresee that [the plaintiff] was likely to behave different than most people under the circumstances." *Santana-Concepcion*, 768 F.3d at 14–15. And although the plaintiff argued that she was "not fully informed," the First Circuit reasoned that under the law of Puerto Rico such an argument "focus[ed] on the wrong perspective." *Id.* at 14.

In this case, Rodriguez similarly homes in on the alleged inadequacy of the information disclosed in the informed-consent forms and on his understanding of that information. As in *Santana-Concepcion*, Rodriguez focuses on the wrong perspective and fails to direct the court to facts the VA healthcare professionals could have relied upon to foresee that Rodriguez "was likely to behave differently than most people under the

circumstances." *Id.* at 13–15. Thus, the court should grant summary judgment on his informed-consent claims.

## IV.    Derivative Claims

Plaintiffs present negligent infliction of emotional distress claims on behalf of Rodriguez's minor and adult children. "As the Puerto Rico Supreme Court has 'repeatedly recognized,' individuals who suffer distress because a relative or loved one is tortiously injured have a cause of action under Article 1802 against the tortfeasor." *Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 57 (1st Cir. 2009) (citing *Santini Rivera v. Serv. Air, Inc.*, 1994 P.R.-Eng 909527, No. RE–93–232, 1994 WL 909527 (P.R. Sept. 12, 1994)). To prevail, "a plaintiff must prove (1) that he has suffered emotional harm, (2) that this harm was caused by the tortious conduct of the defendant toward the plaintiff's relative or loved one, and (3) that the defendant's conduct was tortious or wrongful." *Mendez-Matos*, 557 F.3d at 57. However, this "cause of action is derivative and depends on the viability of the underlying claim of the relative or loved one." *Id.* (citing *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 12–13 (1st Cir. 2007)). Because plaintiffs cannot establish that the government's conduct was "tortious or wrongful," the court should also grant summary judgment on his children's derivative claims.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be **GRANTED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec.*

Rodriguez-Sanchez, et al. v. United States, et al., Civil No. 14-1073 (FAB/BJM)                               14

*Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 16th day of February 2016.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge